## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FRESH KIST PRODUCE, L.L.C.,**

**Plaintiff,**

**v.**

**CHOI CORPORATION, INC. d/b/a
WASHINGTON WHOLESALE
PRODUCE COMPANY** *et al.,*

**Defendants.**

**Civil Action No. 01-1834 (JMF)**

## MEMORANDUM OPINION

Currently pending and ready for resolution is plaintiff's <u>Motion to Disburse PACA Trust Assets in One of Three (3) Alternate Ways and for Reimbursement of Plaintiff's Fees and Costs from the Common Fund</u> ("Mot. to Disburse"), which was referred to me by Judge Urbina for final determination. For the reasons articulated below, plaintiff's motion will be granted in part and denied in part.

## INTRODUCTION

This matter was brought pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.*[1] PACA provides for the establishment of trust funds to protect sellers of perishable agricultural commodities from defaulting buyers. If a buyer defaults by going bankrupt or becoming insolvent, the buyer's trust reimburses the sellers, who are the trust beneficiaries. Congress enacted PACA so that a defaulting buyer's assets would be used to

_____

[1] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

satisfy the trust fund before they are used to satisfy other debts.  This means that the produce

sellers, who are the trust beneficiaries, are reimbursed ahead of most other creditors if a produce

buyer becomes insolvent.

In this case, defendant, Washington Wholesale Produce Company ("WWP"), bought

produce from plaintiff, Fresh Kist Produce ("Fresh Kist"), defendant, J.C. Watson ("JCW"), and

fourteen other companies.  Ultimately, all sixteen companies became PACA trust beneficiaries

of WWP.  In the period between June 6, 2001 and August 6, 2001, JCW accepted $59,189.40 as

partial payment for produce JCW had previously sold to WWP.

Upon learning of JCW's acceptance of payment from WWP, Fresh Kist sued JCW,

WWP, and two other companies, Norfolk Banana ("Norfolk") and Berkley Tomato ("Berkley"),

claiming that the defendants, knowing WWP had become insolvent, continued to accept

payments from WWP when those payments should have gone to the trust fund for the benefit of

all trust beneficiaries.

On August 29, 2001, Fresh Kist obtained a temporary restraining order ("TRO") against

WWP.  Pursuant to the TRO, WWP paid $11,757.50 (the balance of what WWP still owed JCW)

into the court's registry pending resolution of the litigation.

Ultimately, on July 31, 2002, Judge Urbina granted in part and denied in part the parties'

cross motions for summary judgment.  Fresh Kist Produce, L.L.C. v Choi Corp., 223 F. Supp. 2d

1 (D.D.C. 2002) ("Partial Summ. J.").  Judge Urbina found that defendant JCW knew that WWP

was insolvent, and therefore JCW had to disgorge itself of the $59,189.40 it received from WWP

after it became aware of WWP's insolvency.  Id. at 10-11.  Judge Urbina then designated JCW's

$59,189.40 and WWP's $11,757.50 (a total of $75,516.95) as PACA trust funds to be distributed

pro-rata to the trust beneficiaries, including Fresh Kist, JCW, and all other parties submitting

2

valid claims. Id. at 11.

According to Fresh Kist, it incurred $95,290.57 in attorneys' fees and costs as a result of its suit against defendants; it now seeks reimbursement for those fees and costs. Fresh Kist argues that it should either be reimbursed for all of its attorneys' fees and costs out of the PACA trust fund for successfully recovering the trust assets or, alternatively, that JCW should pay Fresh Kist's attorneys' fees as a sanction for JCW's alleged misconduct. Thus, the two issues before me are (1) the disbursement of the PACA trust, and (2) the imposition of sanctions.

## DISCUSSION

I.    Disbursement of the PACA Trust Including Reimbursement of Attorneys' Fees

A.    Background

On September 24, 2001, Judge Urbina issued a Consent Injunction and Agreed Order Establishing PACA Claims Procedure ("PACA Claims Procedure"). The PACA Claims Procedure established the PACA trust fund (valued at $75,516.95) and instituted a process for the filing and service of proofs of claim on the trust.

The deadline for filing a proof of claim was November 16, 2001. PACA Claims Procedure at 5. According to Paragraph 14 of the PACA Claims Procedure,

> [a]ny supplier or creditor who fails to timely file such Proof of Claim with the Court and serve it on those persons listed in ¶13 above, shall be forever barred from thereafter asserting any claim against the Company under the PACA for non-payment of Produce sold, whether in this Court or any other forum.

Id.

Sixteen[2] companies filed proofs of claim, amounting to a total of $420,798.40 in claims

_____

[2] On January 14, 2002, Fresh Kist filed its objections by the objection deadline. Plaintiff's Objections to Claims. Prior to that, JCW filed its reply on January 4, 2002, apparently

3

against WWP.  As illustrated by the chart below, of the sixteen potentially eligible claimants,

only thirteen companies will receive funds from the trust.

**PACA Claimants Filing Proofs**

| | PACA Claimant | Date Proof of Claim was received by Clerk's Office | Date Proof of Claim was File Stamped | Whether Claimant Filed on or by the November 16, 2001 Deadline | Court's Determination as to Timeliness of Filing |
|---|---|---|---|---|---|
| 1. | Berkley Tomato Co. | This proof of claim was not file stamped by the Clerk's Office. Docket Docket [#26] | 11/16/01 | Yes.[3] | The proof of claim will be considered. |
| 2. | Cardille Bros. Mushroom | 11/14/01 Docket [#29] | 11/14/01 | Yes. | The proof of claim will be considered. |
| 3. | Eagle Fruit Traders | 12/04/01 Docket [#42] | 12/04/01 | No. | ***The proof of claim will not be considered as it was not timely filed.*** |

anticipating Fresh Kist's objections. <u>Reply to Fresh Kist's Objection to Proof of Claim</u>.  Judge
Urbina resolved the issue in JCW's favor, finding that JCW had made a valid claim. Partial
Summ. J. at 6.

   [3] On September 16, 2001, Berkley Tomato Co. filed a document captioned "Verified
PACA Proof of Claim of Berkley Tomato Company, Inc."  It was docketed at [#25] and listed on
the docket sheet as "RESPONSE by defendant BERKLEY TOMATO CO to order of 9/24/01
establishing procedures for proof of claim [15-1]; attachment (1) (bm) (Entered: 11/19/2001)."
For some reason, the same document was filed again on September 17, 2001.  This time, the
document was docketed at [#35] and listed on the docket sheet as "CLAIM by defendant
BERKLEY TOMATO CO (td) (Entered:11/30/2001)."  In any event, Berkley Tomato Co.'s
proof of claim was timely filed.

| 4. | Edward G. Rahll & Sons | 11/14/01 Docket [#30] | 11/14/01 | Yes. | The proof of claim will be considered. |
|---|---|---|---|---|---|
| 5. | E.M. Trading Corp. | This proof of claim was not file stamped by the Clerk's Office. Docket [#34] | 11/05/01 | Yes. | The proof of claim will be considered. |
| 6. | First Class Produce, Inc. | 11/14/01 Docket [#31] | 11/14/01 | Yes. | The proof of claim will be considered. |
| 7. | Fresh Kist Produce | This proof of claim was not file stamped by the Clerk's Office. Docket [#28] | 11/15/01 | Yes. | The proof of claim will be considered. |
| 8. | J.C. Watson Co., Inc. | 11/15/01 Docket [#39] | 11/15/01 | Yes. | The proof of claim will be considered. |
| 9. | Joco Products, Inc. | 11/15/01 Docket [#27] | 11/15/01 | Yes. | The proof of claim will be considered. |
| 10. | Muranaka Farm, Inc. | 12/04/01 Docket [#41] | 12/04/01 | No. | ***The proof of claim will not be considered as it was not timely filed.*** |
| 11. | National Onion, Inc. | 12/04/01 Docket [#40] | 12/04/01 | No. | ***The proof of claim will not be considered as it was not timely filed.*** |

| 12. | Norfolk Banana Dist. | This proof of claim was not file stamped by the Clerk's Office. Docket [#24] | 11/16/01 | Yes. | The proof of claim will be considered. |
|---|---|---|---|---|---|
| 13. | North Florida Tomatoes | 11/05/01 Docket [#33] | 11/28/01 | No, but RMU allowed it to be filed. | The proof of claim will be considered. |
| 14. | Pete Pappas & Sons, Inc. | 11/02/01 Docket [#32] | 11/28/01 | No, but RMU allowed it to be filed. | The proof of claim will be considered. |
| 15. | Taylor & Fulton, Inc. | 11/05/01 Docket [#44] | 11/05/01 | Yes. | The proof of claim will be considered. |
| 16. | West Coast Tomato, Inc. | 11/15/01 Docket [#26] | 11/15/01 | Yes. | The proof of claim will be considered. |

B.    Simple Pro-Rata Disbursement of the PACA Trust

In his memorandum opinion, Judge Urbina noted that "when a PACA trust becomes

insolvent, its assets are distributed among beneficiaries pro rata." Partial Summ. J. at 8 (citing In

re Milton Poulos, Inc., 947 F.2d 1351, 1352 (9th Cir. 1991)).

The chart below illustrates the simple pro-rata disbursement of the PACA funds.  Column

1 lists each company that has submitted a valid Proof of Claim.[4]  Column 2 lists the amount of

---

[4] In its filings, Fresh Kist's sample pro-rata distribution chart fails to list E.M. Trading Corp.  However, pursuant to the procedure approved by Judge Urbina, "[a]ny PACA claim listed on a Proof of Claim to which no objection has been filed and served prior to the Objection Deadline, shall be deemed a valid PACA trust claim for the full amount stated in the PACA Proof of Claim."  PACA Claims Procedure at 6.  E.M. Trading Corporation filed its Proof of Claim on November 5, 2001, within the deadline for claims, and no one filed an objection to it. Thus, the claim is valid and is considered by the court in its calculations.

each company's Proof of Claim or Approved Claim Amount.  The Approved Claim Amounts are added together to form a Total Claim Amount.  Column 3 then converts each claimant's dollar amount into a percentage of the Total Claim Amount or Pro-Rata Share of the Total Claim.  Finally, Column 4 lists (in dollars) each company's pro-rata share of the $75,516.95 PACA trust.

**Simple Pro-Rata Disbursement of the PACA Trust**

|  | Column 1: PACA Claimant | Column 2: Approved Claim Amount | Column 3: Pro-Rata Share of the Total Claim | Column 4: Pro-Rata Disbursement of $75,516.94 |
|---|---|---|---|---|
| 1 | Berkley Tomato Co. | $20,941.08 | 7.02% | $5,298.19 |
| 2 | Cardille Bros. Mushroom | $20,188.00 | 6.76% | $5,107.66 |
| 3 | Eagle Fruit Traders | $0.00 | 0.00% | $0.00 |
| 4 | Edward G. Rahll & Sons | $15,206.50 | 5.09% | $3,847.32 |
| 5 | E.M. Trading Corp. | $10,441.00 | 3.50% | $2,641.62 |
| 6 | First Class Produce, Inc. | $11,239.70 | 3.77% | $2,843.70 |
| 7 | Fresh Kist Produce | $67,236.12 | 22.53% | $17,011.06 |
| 8 | J.C. Watson, Inc. | $70,946.90 | 23.77% | $17,949.91 |
| 9 | Joco Products, Inc. | $14,931.50 | 5.00% | $3,777.74 |
| 10 | Muranaka Farm, Inc. | $0.00 | 0.00% | $0.00 |
| 11 | National Onion, Inc. | $0.00 | 0.00% | $0.00 |
| 12 | Norfolk Banana Dist. | $10,230.43 | 3.43% | $2,588.35 |
| 13 | North Florida Tomatoes | $9,383.50 | 3.14% | $2,374.07 |
| 14 | Pete Pappas & Sons, Inc. | $14,672.00 | 4.92% | $3,712.09 |
| 15 | Taylor & Fulton, Inc. | $12,720.00 | 4.26% | $3,218.22 |
| 16 | West Coast Tomato, Inc. | $20,343.50 | 6.82% | $5,147.00 |
|  | TOTALS: | $298,480.23 | 100% | $75,516.94 |

    C.    <u>Pro-Rata Disbursement of the PACA Trust, Including Reimbursement of Attorneys' Fees and Costs under the Common Fund Doctrine</u>

In his September 24, 2001 order, in addition to establishing the trust fund as well as a process for the filing and service of proofs of claim on the trust, Judge Urbina also outlined the

procedure for recovering attorneys' fees and costs from the litigation:

> In order to ensure all trust beneficiaries share in the costs and
> expenses incurred in enforcing the Company's [defendant WWP's]
> obligations under the PACA *on the same pro-rata basis as they are
> accepting the benefits of such actions*, including the prospective
> costs of marshaling the PACA Trust assets for their direct benefit,
> *any counsel may request reimbursement of their fees and costs on
> a common fund theory, with such allowed fees and costs to be paid
> first out of the common pool of assets identified as the 'PACA
> Trust Fund'* created through this procedure, and with such amounts
> to [be] listed on the PACA Trust Chart for any objections by only
> qualified PACA trust claimants.

PACA Claims Procedure at 7 (emphasis added).  The method by which attorneys' fees are

reimbursed, therefore, is not up for discussion, as Judge Urbina explicitly stated that attorneys'

fees would be reimbursed under the "common fund theory."

Fresh Kist's pro-rata share of the PACA trust fund is 15.98%.  Nevertheless, Fresh Kist

requests reimbursement from the PACA trust for 100% of its attorneys' fees and costs, which it

estimates at $95,290.57 (as of May 30, 2003).  See Memorandum in Support of Motion for

Authority to Disburse the PACA Trust Assets and for Reimbursement of Plaintiff's Fees and

Costs ("Mem., Mot. to Disburse") at 3-5.  Fresh Kist calls this Option #2 in its Motion to

Disburse.  In support of its claim, Fresh Kist notes the following:

> [Fresh Kist's] efforts produced benefits to the PACA trust beyond
> the recovery of its own claim.  In order to avoid the inherent
> inequity of having the Plaintiff, alone, bear the expenses of this
> action when those efforts benefitted all similarly-situated PACA
> trust claimants, the Plaintiff respectfully requests the Court to
> direct a common fund fee assessment against the PACA trust to
> assure equal treatment for all those PACA beneficiaries who stand
> to benefit from these efforts.

Id. at 3.

    1.      Timeliness of Request for Attorneys' Fees and Costs

Defendant JCW's initial response to Fresh Kist's claim for attorneys' fees is that the request untimely falls under Federal Rule of Civil Procedure 54(d)(2)(B), which states that "[u]nless otherwise provided by statute or order of the court, the motion [for attorneys' fees] must be filed no later than 14 days after entry of judgment. . . ." <u>PACA Claimant J.C. Watson Co., Inc.'s Opposition to Motion for Authority to Disburse the PACA Trust Assets in One of Three (3) Alternative Ways and for Reimbursement of Plaintiff's Fees and Costs from the Common Fund</u> ("Opp'n to Mot. to Disburse") at 4-6 (citing Fed. R. Civ. P. 54(d)(2)(B)).  JCW points out that Judge Urbina granted partial summary judgment on July 31, 2002 and then modified that judgment by granting pre-judgment interest on March 10, 2003, treating it as a Rule 59(e) motion to modify the judgment.  JCW argues that any attorneys' fees arising out of the summary judgment motion must be sought within fourteen days of the Rule 59(e) modification of that judgment on March 10, 2003 and that, therefore, Fresh Kist's June 2, 2003 application for attorneys' fees is untimely.

While JCW is correct in observing that Rule 54(d)(2)(B) applies to Fresh Kist's request for attorneys' fees, JCW fails to address the first clause of the rule, which specifies, "unless otherwise provided by statute or order of the court." Fed. R. Civ. P. 54(d)(2)(B).  Earlier in this litigation, Judge Urbina issued the PACA Claims Procedure, in which he ordered the following:

> [A]ny counsel may request reimbursement of their fees and costs on a common fund theory, with such allowed fees and costs to be paid first out of the common pool of assets identified as the 'PACA Trust Fund' created through this procedure, and with such amounts to [be] listed on the PACA Trust Chart for any objections by only qualified PACA trust claimants.

PACA Claims Procedure at 7.

Furthermore, Judge Urbina ordered that "[i]f no PACA Trust Beneficiary files an

objection to its proposed pro-rata distributions and common fund fee figures as listed on the PACA Trust Chart within ten (10) days of its being filed, all proposed distributions shall be conclusively determined." Id.

Under Rule 54(d)(2)(B), Judge Urbina's PACA Claims Procedure is a court order that provides a procedure for requesting attorneys' fees, preempting the second half of the rule, which is the default procedure.  The procedure established by Judge Urbina's order requires (1) a request for reimbursement on a common fund theory that is (2) listed on the PACA Trust Chart so that (3) other "qualified PACA trust claimants" may object with ten days. Id.  While no specific date was set for requesting fees, the fees must be requested before the PACA Trust Chart is filed with the court in order to give all claimants an opportunity to object. Id.  Claimants then have ten days to object. Id.

In this case, Fresh Kist did request attorneys' fees under the common fund theory in its June 2, 2003 Motion to Disburse. Mem., Mot. to Disburse at 3-5.  The fees Fresh Kist requested were listed on the PACA Trust Chart in the June 2, 2003 Motion to Disburse as Exhibit B, Option #2.  Other claimants then had ten days to object to the attorneys' fees and to the disbursement.  JCW responded to the motion eleven days later, on June 13, 2003. Opp'n to Mot. to Disburse.  Thus, Fresh Kist's request for attorneys' fees and costs was both timely and appropriate under Rule 54(d)(2)(B) because it followed the procedure identified in Judge Urbina's order.  JCW's objection, on the other hand, was untimely.

2.      The Common Fund Doctrine

In the United States, an award of attorneys' fees is generally done pursuant to the "American Rule."  As the Supreme Court explained, "under the 'American Rule,' parties are ordinarily required to bear their own attorney's fees, and courts follow a general practice of not

awarding fees to a prevailing party absent explicit statutory authority." Buckhannon Bd. & Care
Home v. West Virginia Dep't of Health & Human Res., 532 U.S. 598, 602-03 (2001) (citing
Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y, 421 U.S. 240, 247 (1975)).  In other words,
the American Rule generally prohibits shifting attorneys' fees from the winning party to the
losing party in the absence of a statutory or contractual provision to the contrary. Alyeska
Pipeline Serv. Co. v. The Wilderness Soc'y, 421 U.S. at 257.

The common fund doctrine is a well-recognized equitable common law exception to the
American Rule. Id. at 257-58.  The common fund doctrine allows a court to award attorneys'
fees and costs to a party whose labors have established or protected a common fund for the
benefit of others, either from the fund or from the parties benefitting from the fund. Id.  See also
Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (recognizing the well-established
precedent "that a litigant or a lawyer who recovers a common fund for the benefit of persons
other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a
whole").  The primary rationale for the common fund doctrine is that "unless the costs of
litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the
attorney's efforts." Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1265 (D.C. Cir. 1993).

The key distinction between the American Rule and the common fund exception is that
the shifting of fees and costs does not occur between the winning and losing parties in the
litigation, but between the party creating the common fund and the party or parties benefitting
from the action. Boeing Co. v. Van Gemert, 444 U.S. at 478.  Thus, a defendant's interest in
opposing a common fund doctrine award of attorneys' fees is limited to the interest the
defendant has in the common fund, rather than in the outcome of any underlying litigation. Id. at
479.

11

The D.C. Circuit has not considered whether the common fund exception applies to PACA trust funds.  Most common fund cases in this Circuit are class actions, where the beneficiaries of the fund are the members of the class and the common fund exception allows plaintiffs' attorneys to recover their fees.  However, the "unjust enrichment" principle used to justify the common fund exception in class actions also justifies application of the exception in the context of PACA trust funds.  In both class actions and PACA trust fund litigation, when the attorneys have created a common fund, they should be reimbursed from it.  Otherwise, the beneficiaries will essentially receive pro bono legal services–the "unjust enrichment" that has previously been rejected by this Circuit.  See Swedish Hosp. v. Shalala, 1 F.3d at 1265.

The Ninth Circuit is the only circuit court to date to have applied the common fund exception to a PACA trust.  In re Milton Poulos, Inc., 947 F.2d 1351, 1352 (9th Cir. 1991).  In Milton Poulos, the Ninth Circuit overruled the Bankruptcy Appellate Panel's denial of attorneys' fees, determining that the petitioning attorneys should be compensated under the common fund doctrine for persuading the bankruptcy court to find  the PACA trust "valid and enforceable, thereby permitting the funds to be dispersed among the trust claimants." Id. at 1353.  Several district courts have faced similar issues, and some have ruled that PACA provides for attorneys' fees, while others have ruled that it does not.  See Goldman-Hayden Co. v. Fresh Source Produce, Inc., 217 F.3d 348, 352 n.23 (5th Cir. 2000) (summarizing the cases which discuss whether attorneys' fees should be awarded from a PACA trust fund).

When courts have denied fees, they have concluded that PACA does not allow them to be awarded, but no claimant makes that argument here.  To the contrary, all the PACA beneficiaries agree that attorneys' fees should be paid; they differ only as to how much and who should pay.  Furthermore, Judge Urbina has already indicated that the PACA creditors may apply for

attorneys' fees, deeming the amount collected from WWP, including the disgorgement by JCW, as a common fund.  In the absence of any objection that attorneys' fees are not permitted and in light of the procedure Judge Urbina has already created, I will award fees on a common fund basis.

        3.      <u>Standard of Review</u>

An award of attorneys' fees based on the common fund doctrine must meet all other requirements for an award of attorneys' fees.  As this Circuit has noted, "[w]hen awarding attorneys' fees, federal courts have a duty to ensure that claims for attorneys' fees are reasonable."  <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1265.  Two accepted methods for calculating attorneys' fees are the lodestar and the percentage-of-the-fund methods.  The lodestar method is based upon a calculation of the reasonable hours that were spent multiplied by the reasonable hourly rate for those hours. <u>Id.</u> at 1266.  This "lodestar" may then be "adjusted upward or downward, based on additional factors." <u>Id.</u>  The percentage-of-the-fund method awards the attorneys a reasonable percentage of the common fund, so the attorneys' actual billing hours are not directly reimbursed.

Despite what Fresh Kist claims, in this Circuit, attorneys' fees sought under the common fund doctrine are calculated using the percentage-of-the-fund method adopted by the court in <u>Swedish Hospital</u>. <u>Swedish Hosp. v. Shalala</u>, 1 F.3d at 1271.  According to Fresh Kist, "the entire discussion about 'percentage of the fund' analysis was dicta.  In <u>Swedish Hosp.</u> . . . the disputed issue before the Court was never what the correct percentage 'ought to be' because the class counsel <u>*requested*</u> a twenty (20%) percent contingency fee." <u>Plaintiff's Reply to Watson's</u> <u>Opposition to Motion for Authority to Disburse the PACA Trust Assests in One of Three (3)</u> <u>Alternate Ways and for Reimbursement of Plaintiff's Fees and Costs from the Common Fund</u>

("Rep. to Opp'n to Mot. to Disburse") at 5.  However, Fresh Kist fails to address the real issue of whether the percentage-of-the-fund or lodestar method should apply to common fund attorneys' fee awards.

In <u>Swedish Hospital</u>, the Circuit Court explicitly stated that it had to decide "whether the District Court erred in not utilizing the lodestar to determine the appropriate fee." <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1265.  After analyzing in great detail the merits of the percentage-of-the-fund method versus the lodestar method, the court held the following: "In sum we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases." <u>Id.</u> at 1271.  The court further noted that the percentage-of-the-fund calculation places a lighter burden on the court and the parties than the lodestar method, because there is no dispute over billing practices. <u>Id.</u> at 1269-70.

Since <u>Swedish Hospital</u>, this court has consistently applied the percentage-of-the-fund method to common fund attorneys' fee disputes.  <u>See In re Baan Co. Sec. Litig.</u>, 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (noting that "this Circuit has elected to use the percentage method"); <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, No. Civ.A.99-0790, 2003 WL 22037741, at *7 (D.D.C. 2003) (same); <u>In re First Databank Antitrust Litig.</u>, 209 F. Supp. 2d 96, 98 (D.D.C. 2002) (same).  Given this clear precedent, Fresh Kist offers no convincing legal argument as to why the percentage-of-the-fund method should not apply in this instance.

While Fresh Kist erred in failing to recognize this Circuit's use of the percentage-of-the-fund method, it correctly noted, citing <u>Swedish Hospital</u>, that "a trial court enjoys substantial discretion in making reasonable fee determinations." Mot. to Disburse at 7 (citing <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1271).  The D.C. Circuit elaborated on this principle when it

14

stated:

> In common fund cases, it is not the creation of the fund itself that
> entitles the attorneys to be paid from the fund.  Rather, any
> obligation that the fund incurs to pay attorneys' fees must result
> from the exercise of the court's inherent equitable power to assess
> fees against those who stand to ultimately benefit from the fund.

Democratic Cent. Comm. of the District of Columbia v. W.M.A.T.A., 38 F.3d 603, 605 (D.C.
Cir. 1994) (citation omitted).

Therefore, the court must be sensitive to underlying equities when determining attorneys'

fee awards in common fund cases.

This Circuit does not employ a specific test for reasonableness in percentage-of-the-fund

cases.  Rather,

> [c]ourts have looked to several factors in assessing the
> reasonableness of a fee request, including: (1) the size of the fund
> created and the number of persons benefitted; (2) the presence or
> absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and
> efficiency of the attorneys involved; (4) the complexity and
> duration of the litigation; (5) the risk of nonpayment; (6) the
> amount of time devoted to the case by plaintiffs' counsel; and (7)
> the awards in similar cases.

In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 17 (citing In re Lorazepam & Clorazepate Antitrust
Litig., No. Civ.A.99-0790, 2003 WL 22037741, at *8 (D.D.C. 2003)).

Even with consideration of the seven Lorazepam factors, however, "a majority of

common fund class action fee awards fall between twenty and thirty percent." Swedish Hosp.

Corp. v. Shalala, 1 F.3d at 1272.  We will therefore start with the 20% figure, used by the court

in Swedish Hospital, and then consider the Lorazepam factors to make any necessary upward or

downward adjustments.

  4.  Lorazepam Analysis of a Reasonable Percentage-of-the-Fund Award

    a.  The Size of the Fund

The PACA trust is worth approximately $75,516.95, created for the benefit of fifteen companies, for an average recovery of approximately $5,000 per beneficiary.  Thus, the recovery in this case will necessarily be small, as compared, for example, to the recovery of the class of beneficiaries in Swedish Hospital, where the attorneys contributed to the recovery of $10 million to be divided among a class of hospitals. Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1272.  In that case, the court awarded plaintiffs' attorneys a twenty percent common fund award. Id.  In another class action, where the attorneys recovered $4,514,720.30 for a class of public transit riders in Washington, D.C., the court awarded a fee equivalent to 22.3% of the common fund. Democratic Cent. Comm. of the District of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d 1568, 1574-75 (D.C. Cir. 1993).  In a third case, one involving a potential class of over 55,000 members, defendants settled for $35,000,000, and the court granted the attorneys a 30% common fund award. In re Lorazepam & Clorazepate Antitrust Litig., No. CIV.A.99-0790, 2003 WL 22037741, at *3-8 (D.D.C. 2003).  Many common fund cases in this Circuit have resulted in multi-million dollar settlements or verdicts, thus placing the $75,516.95 award at issue in this case at the low end of the spectrum.  As the chart on page 6 indicates, most claimants are recovering between 2.23% and 4.98% of what they were owed.  JCW is recovering 16.86% and Fresh Kist 15.98%.  Given the losses the PACA creditors have suffered, and the relatively small size of the fund, 20% to the lawyers seems fair.

       b.     Substantial Objections by Class Members

Not surprisingly, JCW makes "substantial objections" to Fresh Kist's attorneys' fees request. See Memorandum in Support of Option Three of Plaintiff's Motion for Authority to Disburse the PACA Trust Assets at 1-2.  JCW concedes that, if a percentage-of-the-fund award is made, it should only be for 20%, the minimum recommended in Swedish Hospital, but also

insists that Fresh Kist should have done a better job collecting money for the trust. Opp'n to Mot. to Disburse at 6-11.

JCW argues  that Fresh Kist became "a trustee of all Debtor's [WWP's] trust assets" and, therefore, had a duty to collect as much of WWP's assets for the trust fund as possible. Id. at 8. JCW claims that because Fresh Kist failed to fulfill this duty by not recovering any assets beyond those involved in this litigation, the attorneys' fees awarded should be, at most, "a very modest percentage of the funds added to the pool." Id. at 8. This argument is entirely based on surmise, i.e., that WWP must have had more assets and, had Fresh Kist collected them, the recovery to all of the PACA creditors would have been greater.  JWC never indicates how much greater the recovery would have been or why there is any reason to believe that it made economic sense to go after a particular asset and what that asset, once recovered, would have yielded.  In any event, claiming that Fresh Kist could have collected more money does not compel the conclusion that its attorneys should receive a smaller check for what they did recover.[5]

        c.      The Skill and Efficiency of the Attorneys

The attorneys' skill and efficiency may entitle them to a higher or lower award.  In In re Baan Securities Litigation, for example, the court reduced plaintiff's requested attorneys' fees

---

[5] Note that Berkley Tomato Co. and Norfolk Banana Distributors Co. favor an attorneys' fees award to Fresh Kist of 20% of the total amount recovered. Response and Limited Opposition of Mary Jean Fassett and McCarion & Diess to Motion for Authority to Disburse the PACA Trust in One of Three (3)Alternate Ways and for Reimbursement of Plaintiff's Fees and Costs from the Common Fund at 2.  PACA Trust members Cardile Bros, Mushroom Pkg., Inc, Edward G. Rahll & Sons, Inc., First Class Produce, Inc., Joco Produce, Inc., and West Coast Tomato, Inc., noted their support for Fresh Kist option #3, in which JCW would reimburse Fresh Kist for 100% of its attorneys' fees. Memorandum in Support of Option Three of Plaintiffs' Motion for Authority to Disburse the PACA Trust Assets.

from 32% to 28%, having found that "[w]hile Plaintiff's Counsel often prosecuted this case with skill and efficiency . . . there were excessive delays and inefficiencies that plagued this litigation, and these were due in large part to counsel's less than exemplary performance on several occasions." In re Baan Sec. Litig., 288 F. Supp. 2d at 20.  JCW alleges Fresh Kist was inefficient in prosecuting the litigation. Opp'n to Mot. to Disburse at 11 n.6.  I have reviewed the record in this case, and while I find that the pleadings submitted by all parties were excellent, I cannot say that Fresh Kist's counsel prosecuted this matter with any more or less professional skill than I would expect any lawyer to display in this court.

       d.       The Complexity and Duration of the Litigation

     In In re Baan Securities Litigation, where the court awarded attorneys' fees equal to 28% of the common fund, plaintiffs' counsel had to do the following:

> [Plaintiffs' Counsel] had to review and analyze thousands of financial and accounting documents regarding Baan's many transactions with affiliated parties that were in dispute.  Plaintiffs' Counsel had to master complicated accounting principles regarding the accounting treatment to be accorded to sales of Baan's software licenses.  Plaintiff's Counsel also had to address difficult and novel legal questions resulting from [two parties'] incorporation in the Netherlands, such as the interpretation and impact of Dutch law on the conduct of the named Defendants; the enforceability of judgments in the United States against Netherlands companies; and the Court's jurisdiction over Netherland's residents.

In re Baan Sec. Litig., 288 F. Supp. 2d at 17-18.

     In another case, the attorneys were awarded 23.3% of the common fund:

> [Attorneys were required] (1) to obtain a $4,976,124.79 judgment for unpaid restitution; (2) to institute two foreclosure proceedings . . . (3) to institute attachment (garnishment) proceedings . . . (4) to employ expert counsel in an attempt to enhance the value of [property]; and (5) to institute a broadly based fraud claim against [defendants] . . . .

Democratic Cent. Comm. of the District of Columbia v. Washington Metro. Area Transit Comm'n, 12 F.3d 269, 271 (D.C. Cir. 1994).

In the case before me, plaintiff's attorneys took depositions and filed pleadings, including the complaint and a motion for summary judgment.  In contrast to the cases just quoted, and others, when Fresh Kist entered the litigation, it already had the benefit of JCW's affidavits and pleadings from the previous case.  These affidavits and the pleadings led Judge Urbina to conclude that JCW was aware of WWP's insolvency when it accepted payment. Partial Summ. J. at 9.  That determination was crucial to his awarding Fresh Kist partial summary judgment. None of the remaining issues or litigation techniques in this case appear to warrant its being viewed as a Herculean effort comparable to the efforts in those cases in which the court considered an upward adjustment to be appropriate.

This case has been in litigation for approximately four years, and Fresh Kist seeks fees and costs for the period from August 2001 to May 2003.  Some common fund cases in this Circuit have been in litigation for approximately five years and have resulted in awards of 28% and 23.3%, respectively. In re Baan Co. Sec. Litig., 288 F. Supp. 2d at 22; Democratic Cent. Comm. of the District of Columbia v. Washington Metro. Area Transit Comm'n, 3 F.3d at 1574-75.  Without more, an overall four-year period of litigation, including a 21-month  period of most intense activity, is not significant enough to weigh in Fresh Kist's favor.

e.      The Risk of Nonpayment

Several of the other common fund cases in this Circuit involved high levels of risk.  The attorneys in In re Baan Securities Litigation faced "a serious risk of no recovery given the many disputed legal and factual issues that may ultimately have been resolved in Defendants' favor," such as the court's jurisdiction over persons and companies in the Netherlands. In re Baan Sec.

Litig., 288 F. Supp. 2d at 19.  In another case, an antitrust class action suit, the court acknowledged that the "risk of nonpayment through either an award of summary judgment to Defendants or loss at trial was significant and real in this case." In re Lorazepam & Clorazepate Antitrust Litig., No. CIV.A.99-0790, 2003 WL 22037741, at *8 (D.D.C. 2003) (citation and internal quotation marks omitted).  Fresh Kist did not face a risk of non-payment thtat was greater or less than any other PACA case, where the very *raison d'être* of the lawsuit is that the debtor is insolvent.

f.      The Amount of Time Devoted to the Case

The amount of time Fresh Kist's counsel devoted to the case on behalf of the trust was 386.4 hours.  See Ex. 4 to Mot. to Disburse at 2.  The major common fund cases in this Circuit do not focus on billable hours because the fee awards are based on percentage-of-the-fund rather than lodestar method.  Nevertheless, expending 386.4 hours, or 48.3 days, in the 21-month period of time for which counsel billed is not so great an amount of time as to warrant an adjustment above 20%.

g.      The Awards in Similar Cases

As discussed above, the seminal case in this area is Swedish Hospital.  In Swedish Hospital, this court awarded plaintiffs' counsel twenty percent of the common fund.  Other cases, where the percentage of the fund award was higher, involved unusual circumstances, such as the jurisdictional issues in In re Baan Securities Litigation.  Few cases in this Circuit, if any, involve awards of less than 20%, and JCW's counsel failed to identify any that did.

h.      Conclusion

Based on the court's analysis of the seven Lorazepam factors, Fresh Kist's attorneys will be awarded 20% of the common fund for successfully recovering monies from WWP and JCW

20

for the benefit of all trust beneficiaries.  There are no extraordinary circumstances that would require an adjustment of the 20% figure.  Fresh Kist suggests a higher award is in order because JCW unnecessarily protracted the litigation.  However, this claim bears on the issue of sanctions more appropriately than on the issue of a common fund attorneys' fee award.  Similarly, JCW presents no convincing evidence to suggest that Fresh Kist's attorneys should receive less than the customary 20% award.

The purpose of a common fund attorneys' fee award is to avoid the unjust enrichment of the beneficiaries of the common fund, which, in this Circuit, is accomplished by reimbursing attorneys with a reasonable percentage-of-the-fund fee award. <u>Swedish Hosp. Co. v. Shalala</u>, 1 F.3d at 1265, 1271.  In this case, a 20% figure adequately accomplishes this purpose without deducting an excessive amount from the trust fund.

Below is a chart showing the apportionment of the PACA trust fund between Fresh Kist's attorneys, who will receive 20% of the fund, and the beneficiaries, who will receive 80% of the fund.

**Disbursement of the PACA Trust Fund with Common Fund Attorneys' Fee Award**

| Party | Percentage of the Common Fund | Dollar Value of the Percentage of $75,516.95 PACA Trust Fund |
|---|---|---|
| Fresh Kist's attorneys | 20% | $15,103.39 |
| All PACA trust fund beneficiaries | 80% | $60,413.56 |

D.    <u>Calculation of Pre-Judgment Interest</u>

Before ordering a final disbursement, the court must determine the actual value of the PACA trust fund today.  This final dollar figure may then be divided into the two percentage

pools that reflect Fresh Kist's attorneys' recovery and the PACA trust fund beneficiaries' recovery. On March 10, 2003, Judge Urbina granted Fresh Kist's motion to amend the partial summary judgment so that JCW was compelled to pay *pre*-judgment interest on the amount of the PACA trust fund that it wrongly accepted from WWP. See <u>Memorandum Opinion Granting the Plaintiff's Motion to Amend the Court's Judgment</u> ("March 10, 2003 Mem. Op."). According to the order issued by Judge Urbina, "[i]nterest is due from the date JCW received the post June 4, 2001 payments from WWP up to July 31, 2002, the date of the court's Memorandum Opinion ordering disgorgement, and shall be paid at the statutory rate." <u>Id.</u> at 10.

Fresh Kist includes a calculation of interest in the three "options" it outlines in its Motion to Disburse. According to Fresh Kist, JCW owed interest from June 5, 2001 to June 1, 2003 for a total of $4,570.55, with an additional $44.64 added each week after June 1, 2003. See Mot. to Disburse, Exs. 1, 2, 3. The caption beside this calculation on Options 1, 2, and 3 says "Interest (pre&post judgment at Sec. 1961 rate)." See Mot. to Disburse, Ex. 1. "Sec. 1961" refers, presumably, to 28 U.S.C. § 1961, which is the statutory provision for awarding post-judgment interest in federal civil litigation. Thus, Fresh Kist's position appears to be that JCW owes both pre- and post-judgment interest on the $59,189.40. However, this clearly goes beyond the dictates of Judge Urbina's memorandum opinion, which specifically states that "JCW must pay interest on all funds received from WWP on or after June 5, 2001" and that "[i]nterest is due from the date JCW received the post June 4, 2001 payments from WWP up to July 31, 2002, the date of the court's Memorandum Opinion ordering disgorgement, and shall be paid at the statutory rate. 28 U.S.C.A. § 1961." March 10, 2003 Mem. Op. at 10.

In terms of calculating the exact amount of pre-judgment interest owed, we know that JCW received $6,000 on August 7, 2001; $9,000 on August 10, 2001; $15,000 on August 16,

2001; and $15,000 on August 23, 2001, for a total of $45,000.  See Mot. to Disburse, Ex. 5C,

Dep. of Nancy Carter at 101.  We also know that WWP was ordered to make its final payment

into the court's registry pursuant to a temporary restraining order.  Finally, while we know that

JCW ultimately received a total of $59,189.40 from WWP, we do not know when JCW received

the remaining $14,189.40.  Therefore, I will order Fresh Kist to file a praecipe indicating the

date or dates upon which final payments were received.  At that point, the court will calculate the

appropriate pre-judgment interest.

     E.    Final Disbursement of the PACA Common Fund Trust

Once the amount of pre-judgment interest has been calculated, that amount will be added

to the $70,946.40 already in the trust.  Then, 20% of that total will be awarded directly to Fresh

Kist's attorneys.  The remaining 80% will then be distributed on a pro-rata basis to the thirteen

companies that filed valid proofs of claim.

II.    Sanctions

     A.    Fresh Kist's Contentions

The 20% fee awarded recognizes the value of the services rendered by Fresh Kist's

counsel (hereafter "Keaton").  Fresh Kist, however, wants much more and insists that JCW pay

Keaton's entire bill based on Keaton's hourly rate and hours spent ("the lodestar") as well as its

costs.  But, as I have just explained, in this Circuit, a percentage of the fund is the only proper

measure of the fee to be awarded in a common fund case, and a lawyer cannot claim a

percentage of the fund *and* his lodestar from an opponent simultaneously.

Additionally, I have already determined that 20% is fair recognition of the opposition

Fresh Kist faced and what it achieved in the face of it.  Even if, as JCW claims, it made Keaton's

work more difficult than it should have been, by either proper or improper behavior, Keaton's

achievement has already been compensated by the fees I have awarded.  That a lawyer will face significant resistance in securing victory for his client, with the result that his fee is less than the lodestar, is the risk that the lawyer takes when he undertakes the representation.

      B.      <u>Controlling Legal Principles and Why the Court Cannot Fine JWC</u>

Any increase in the fee being awarded to Fresh Kist would therefore have to find some other justification besides the principles applied in common fund cases.  Fresh Kist answers that JCW should be punished because its opposition was based on JCW's contradicting the statements it made to this court in another case and because its opposition was otherwise unjustified.  Fresh Kist therefore looks to rules and a statute that it claims justify reimbursement at the rate of Keaton's lodestar.  But, each of the rules and the statute Fresh Kist cites permits a party to recover only those fees or expenses incurred by virtue of a violation. 28 U.S.C. § 1927 (multiplying proceedings requires attorney to satisfy costs and fees "reasonably incurred because of such conduct"); Fed. R. Civ. P. 37(c) (failing to admit a matter may result in requiring party to pay the reasonable expenses incurred in her opponent's making the proof of the matter not admitted); Fed. R. Civ. P. 56(g) (submitting an affidavit in bad faith and for purpose of delay results in party's having to reimburse opponent for any cost incurred by the filing of that affidavit); Fed. R. Civ. P. 11 (c)(2) (limiting fees and costs awarded to those "incurred as a direct result of the violation [of the Rule]").

 Even if JCW's behavior caused Fresh Kist to have to establish facts unnecessarily or made the briefing of the motion for summary judgment more complicated or even unnecessary, it would justify only an increase in the fee being awarded that was no greater than the fees incurred because of what JCW did; the rest of the fees would have been incurred anyway. Hence, there would have to be some basis in the record to make the ascertainment of what JCW

made Keaton do unnecessarily and what Keaton would have had to do anyway.  Fresh Kist,

however, provides none.  While Keaton submits his billing records, he does not point to a single

one that would not have existed or would have been reduced had JCW not done what he claims it

did.  Indeed, he does not even offer an overall estimate of what the difference would have been.

In fact, I have reviewed the billing records and found only nine references that, for example,

specifically refer to Fresh Kist's seeking Rule 11 sanctions against JCW.[6]  None of the other

entries permits me to differentiate how JCW's allegedly improper behavior increased the total

cost to Fresh Kist of Keaton's service.  There is no  information upon which I can ascertain how

JCW's objectionable behavior increased Keaton's fees.  Additionally, there is no way to

differentiate between what JCW forced Keaton to do unnecessarily and what Keaton would have

done any way.  Awarding Fresh Kist Keaton's lodestar would therefore obviously violate the

statute and rules upon which Fresh Kist relies.

   Indeed, the central principle animating the award of sanctions is that they must always

be proportionate to the wrong and damage done.  <u>Bonds v. District of Columbia</u>, 93 F.3d 801,

808 (D.C. Cir. 1996).  The court has no authority to accept Keaton's demand that JCW be, as it

were, "fined" the amount of Keaton's lodestar as punishment for JCW's wrongs irrespective of

whether JCW's actions affected the amount of time Keaton had to expend.

   C.     <u>How JCW's Actions Allegedly Caused Keaton to Do More</u>

   The importance of segregating what Keaton would have done in the normal course from

what JCW made him do is better understood through a more detailed and particularized analysis

---

[6] I identify these entries in the chart that is an appendix to this Memorandum.  Note that the time and fees that appear in the totals exaggerate the time spent on Rule 11 matters.  The entries marked with an asterisk reflect work done in addition to Rule 11 work.  Even then, the total hours were 19.3 and the fees $3979.50.

of Fresh Kist's complaints about JCW.  Keaton lists those actions in Exhibit 5 to plaintiff's

Motion to Disburse.  In that exhibit, entitled "Listing of [JCW's] Misconduct and Violations,"

Fresh Kist examines in detail the responses JCW made to its First Set of Request for Admissions

and then shows why the response made was either an unjustified refusal to admit known facts or

was false and misleading.

I have analyzed this claim in the following chart in which I indicate (1) what Fresh Kist

demanded JCW admit or deny, (2) JCW's response, and (3) the documents that Fresh Kist

indicates establish that JCW's refusal to admit was unjustified.

| Number | Request for admission by Fresh Kist | Response by JCW | What had to be secured to prove what JCW had previously stated or what Fresh Kist otherwise had to do |
|---|---|---|---|
| 29 | After PACA trustee failed to remit further weekly payments, JCW filed suit on August 2, 2001. | Denied. | Statement to that effect was included in the affidavit of JCW counsel (James) submitted in other case (01-1225).  Fresh Kist merely had to secure it.  Carter deposition, secured by Fresh Kist in the instant case, provides additional evidence. |
| 38 | PACA trustee told JCW that PACA trustee could not satisfy JCW's claim due to financial problems. | Denied. | Affidavit of JCW counsel (James) submitted in other case (01-1225) showed that James was told that the PACA trustee was having financial problems.  Press affidavit, secured by Fresh Kist in the instant case, showed that James was told that the PACA trustee may not have sufficient assets to satisfy JCW's claim in full. |

| 39 | PACA trustee agreed to satisfy JCW's claim through weekly payments. | Denied. | Affidavit of JCW counsel (James) submitted in other case (01-1225) confirmed that fact. Fresh Kist merely had to secure it. |
|---|---|---|---|
| 41 | JCW learned of other potential PACA claims against the trustee. | Admitted that at some point JCW learned of other unpaid produce sellers with claims against the PACA trustee. | Carter deposition in instant case is additional evidence of such knowledge. |
| 45 | Fresh Kist called JCW's lawyers to notify JCW of Fresh Kist's unpaid PACA claim against the PACA trustee. | Admitted that in August, 2001, Fresh Kist contacted JCW's attorney in August, 2001 to discuss matters other than Fresh Kist's unpaid claim. | Cassell deposition in the instant case, secured by JCW, as well as affidavit of JCW counsel (Rynn), submitted in the instant case in support of JCW's motion for summary judgment, are evidence that such calls took place but not evidence that the purpose of the calls was notification. |
| 46 | Fresh Kist discussed the nature of its claim against the PACA trustee with one of JCW's attorneys. | Privilege first asserted and then withdrawn. It was ultimately denied. | There was no litigation over the privilege claim. Cassell deposition and Rynn affidavit are evidence that such calls took place. Rynn affidavit provides evidence of the content of the conversation. |
| 47 | JCW's attorneys refused to represent Fresh Kist after Fresh Kist requested admission to PACA trust action filed by JCW. | Admitted that Rynn and Jankowsky informed Fresh Kist that they were unable to represent it because of a conflict of interest. | There was no litigation over the privilege claim. Cassell deposition and Rynn affidavit provide differing recollections of the conversations between Cassell, Rynn, and Fresh Kist regarding JCW's PACA trust action. |
| 51 | JCW received payment(s) from the PACA trustee after August 23, 2001. | Denied. | Confirmed by Carter declaration submitted in instant case in support of JCW's motion for summary judgment. |

| 52 | JCW discussed unpaid invoices owing from PACA trustee, with agents of Western Growers Association. | Denied. | Confirmed by Rynn affidavit submitted in instant case in support of JCW's motion for summary judgment. |
|---|---|---|---|
| 54 | When JCW received first payment of $4,729.80 from the PACA trustee, in June 2001, JCW knew or had reason to know that the PACA trustee had other unpaid produce suppliers. | Denied. | Filing in other case by Norfolk Banana Distributors and Berkley Tomato on May 30, 2001 confirmed alleged failure of PACA trustee to pay PACA trust claims.  Fresh Kist merely had to secure it. |
| 55 & 56 | Same as above as to two later payments of $4,729.80. | Denied. | Same as above. |
| 57 | At the time JCW received the first payment under the Consent Order for Preliminary Injunction from the PACA trustee, JCW knew or had reason to know that the PACA trustee had other unpaid produce suppliers. | Denied. | Same as above. |

| 58 | At the time JCW received the second payment under the Consent Order for Preliminary Injunction, JCW knew or had reason to know the PACA trustee had other unpaid produce suppliers. | Denied. | Confirmed by Press affidavit, secured by Fresh Kist in instant case, and JCW internal document identified by Carter in her deposition, secured by Fresh Kist in instant case; Fresh Kist merely had to secure the internal document. |
|---|---|---|---|
| 68 | JCW participated in several conversations with Mrs. Min Park of the PACA trustee prior to the date JCW filed its first complaint against the PACA trustee on or about June 5, 2001 | Privilege first asserted and then withdrawn. It was ultimately denied. | There was no litigation over the privilege claim. James affidavit submitted in other case (01-1225) confirmed that fact.  When privilege withdrawn, Fresh Kist merely had to secure the document. |
| 72 | From June 5, 2001, JCW received $59,189.40 from PACA trustee, when JCW knew of other unpaid suppliers. | Admitted payments but denied that it had reason to know PACA trustee had other unpaid suppliers during this period. | Confirmed by Press affidavit, secured by Fresh Kist in instant case, and JCW internal document identified by Carter in her deposition, secured by Fresh Kist in instant case; Fresh Kist merely had to secure the internal document. |
| 73 | From June 5, 2001, JCW received $59,189.40 from PACA trustee when JCW knew or had reason to know that PACA trustee did not have the financial ability to satisfy claims of JCW or the PACA trustee's other unpaid creditors. | Denied. | Confirmed by JCW's original and amended complaint, James affidavit submitted in other case (01-1225), and Carter declaration submitted in instant case in support of JCW's motion for summary judgment. |

D.    Analysis of the Chart

A review of this chart first indicates that, as Fresh Kist should have told the court but did not, there were two responses by JCW to Fresh Kist's First Request for Admissions, an initial one and an amended one.  Fresh Kist premises its list of "[JCW's] Misconduct and Violations" on the initial one and ignores the amended one.  In the amended one, however, JCW withdrew all of its privilege claims.  Since it did so, Fresh Kist could not possibly have spent any time litigating the validity of those claims and, therefore, JCW's actions cost Fresh Kist nothing.

Second, as the chart makes clear, many of the documents upon which Fresh Kist relied to support its conclusion that JCW's answers to the Requests for Admission were improper were already part of record in the case JCW had itself brought against WWP.  Indeed, the gravamen of Fresh Kist's complaint against JCW is that the factual assertions it made in this case were contradicted by the factual assertions it made the earlier case.  But, since those earlier assertions were in the public domain, all Fresh Kist had to do to get them was look in the court file.  While Fresh Kist would then have had to marshal the significance of the prior assertions in support of its present contentions, their presence in the public record meant that this was all Fresh Kist had to do. This is nothing like the burden on a lawyer who must investigate a case independently, searching for witnesses and documents, using discovery to gather additional information, before she can argue their significance.

Third, although Fresh Kist relies on affidavits of JCW employees and lawyers in this case to support its contention as to the impropriety of JCW's responses, Fresh Kist did not have to secure these.  They were already submitted by JCW.  All Keaton had to do was argue their significance.

Finally, if one disregards the affidavits and documents filed by JCW, either in this case or in the earlier case, the only documents Fresh Kist obtained or created are (1) the declaration of Dan Press ("Press"), WWP's lawyer and (2) the deposition of a JCW sales manager (Carter). It is impossible to estimate how much time Fresh Kist spent in securing the declaration of Press and the internal document and how much time it took within the deposition to secure the part upon which Fresh Kist relies. It can be said, however, that doing these three things, and then arguing the significance of their existence, could not possibly have cost Keaton's client $95,290.57, *i.e.*, the total cost of Keaton's services on behalf of Fresh Kist.

The above analysis underlines how Fresh Kist is seeking a fine that is completely unsupported by evidence in the record demonstrating how the amount sought relates to what JCW did and did not do, and the consequences of its acts and omissions for the fees Keaton charged his client. Furthermore, as I have explained, the rules and statutes upon which Fresh Kist relies do not permit such a fine.

CONCLUSION

Fresh Kist will be awarded a fee of 20% of $75,516.94 plus 20% of the interest on the $59,189.40, an amount that is yet to be calculated. An Order accompanies this Memorandum Opinion.

_____

JOHN M. FACCIOLA

Date:                                UNITED STATES MAGISTRATE JUDGE